# Peries *against* Aycinena.

It is a general principle that a plaintiff cannot join in the same declaration a demand as executor or administrator, with another which accrued in his own right; but if the money recovered in each of the counts will be assets, the counts may be joined in the same declaration.

In a suit by an executor in assumpsit, a count for work and labour may be joined with a count for work done by the testator, where it appears that the money recovered in the suit will be assets in the executor's hands.

Therefore, such counts may be joined in a suit by an executor to recover compensation for services rendered by the testator in his lifetime, as attorney for the defendant, and afterwards by the executor as attorney in completing the same business: the duty of so doing being thrown upon the executor by the laws of the country, and acquiesced in by the client.

In such case it is not necessary to set out the contract specially; common counts are sufficient, especially after verdict.

The Spanish-American Colonial law enacted, that if an attorney died after he had commenced a suit, his heirs can and ought to finish what he had commenced, provided they are men fit to do it. Distinguished jurists under that law were of opinion, that the word "heirs" included executors. *Held*, that the executor was authorized to carry on and complete a business commenced by the testator, having been recognised by the Spanish tribunal, and approved of by the client.

If an attorney has power to compromise, his substitute duly appointed has the same power.

By the death of an attorney, the power of his substitute necessarily ceases.

ERROR to the District Court for the city and county of *Philadelphia*.

This was an action brought by Mariano de Aycinena, executor of Juan Fermin de Aycinena, against Adolphus Peries, administrator with the will annexed of James Yard. The declaration contained seven counts, of which five were for money paid and services rendered, by Don Juan Fermin de Aycinena, and the two others for money paid and services rendered, by his executor, Mariano de Aycinena. The claim was for money paid and services rendered, by Juan Fermin, as agent or attorney of James Yard, and money paid by Mariano the executor of Juan Fermin. The following statement is a compendium of the facts of the case and the evidence.

In the year 1800, James Yard, at the instance of two persons, Ramirez and Echeverria, the agents of a merchant of the name of Yrissari, made shipments to the port of Sonsonate, on the western coast of Guatemala, under certain Spanish licenses from the president of Guatemala. It would seem to have been the agreement of the parties, that the shippers should furnish the capital; and that in consequence of the supposed advantage which it

[Peries v. Aycinena.]

was believed would attend the shipments, the profits should be. equally divided between them and Yrissari. The shipments, for an obvious reason, were made in the name of Yrissari, who was a Spanish subject, to whom and for whose benefit the licenses were granted. The vessels, on touching at Lima, in Peru, were seized, on the ground, or perhaps pretence, that the president's licenses could not extend to Peru. The cargoes were sequestered and sold, and the proceeds paid into the royal treasury. Mr Yard, in consequence of his severe loss in this adventure, took the benefit of the Bankrupt Law, and in the year 1803, representing his assignees, and other persons who were concerned in the shipment in question, went to Spain to seek redress. The whole matter was confided to him; and, after a long and laborious negotiation, he succeeded in obtaining a royal order, on the treasury of Guatemala, for the amount due from Yrissari. This order made it necessary to ascertain, by judicial measures, the amount due from Yrissari to Mr Yard. For this purpose he sent an agent (Mr Baxter), to Lima, but without success, in consequence of difficulties resulting in part from the remote situation of the provinces and the colonial policy of Spain, but more especially, as Mr Yard says, from the character of Yrissari, which had developed itself in a form to excite a belief that it was his determined purpose, (exhibited by his agents at Madrid, as well as after the royal order), to defraud the other parties of the whole of the property. His attempt to endeavour to effect a settlement with Yrissari, which was indispensable before he could demand payment of the president of Guatemala conformably to the terms of the royal order, was baffled.

Matters continued in this situation until some time in the year 1807, when a letter was received by Mr Yard, dated Guatemala, September 3, 1806, signed by the executors of Yrissari, giving information of his decease, on the 5th of May 1805. This letter enclosed an account current of the deceased with Mr Yard. It also gave advice of an attachment being laid on $180,000 of the funds deposited there. It contained an offer to pay to Mr Yard the balance or surplus, $59,197, provided he would receive it in cocoa, at $25 per cwt.; for the receipt of which he was to send a vessel to a small port adjacent to Omoa. This letter, and other circumstances developed in the memorial of Mr Yard, served to convince him, that the plans of fraud adopted by Yrissari, would be scrupulously followed by his executors, of whom his former agent, Echeverria, was one, and his son another. The intelligence contained in the letter, together with a notification by the Spanish consul, of some formal proceedings on the part of the executors of Yrissari, which had recently taken place at Guatemala, which portended a ruinous termination of the concern, rendered it necessary either to abandon the claim wholly, or that the parties should make a final effort to extricate themselves. The charge of the

III. — 9      F *

whole concern having been intrusted to Yard, he determined to prosecute the business with vigour; and accordingly, after having prepared the proofs and documents, he prepared and transmitted, with the most ample power, a letter of attorney to Don Juan B. Oyarzabal, of Lima, and the Marquis Vicente de Aycinena, with a power of substitution.

The first advices received from Lima were in a letter from Mr Oyarzabal, dated in Lima, informing Mr Yard, that through his instrumentality, the attachment of the $180,000 had been withdrawn, and notice thereof transmitted to the Marquis of Aycinena. A letter, also, from the Marquis of Aycinena, was received, dated the 10th of August 1809. He advised Mr Yard of the receipt of his powers and documents, and informed him he had taken measures to settle his accounts with the executors of Yrissari, by referring all matters in variance to an amicable tribunal, called *jueces arbitros*, literally, judges arbitrators,—a legal mode of procedure, corresponding to our mode of referring under a rule of court, and equally binding with that held in the ordinary courts. The cause was referred to Don Juan Moreno, and Don Jose De Valle. The arbitration resulted in obtaining a judgment against the executors of Yrissari for a large sum of money. Immediately on the award being made, the estate of Yrissari was declared bankrupt, and surrendered to his creditors. This bankruptcy made it necessary to ascertain whether Mr Yard was or was not entitled to a preference for his demand upon the sum which had been deposited in the royal treasury at Lima. It was then agreed by the creditors of Yrissari, and all the parties in interest, that the matter of the assignment, and all the facts connected with it, should be decided by arbitrators, reserving to each of the parties the right to appeal from their decisions to other arbitrators, named by the parties concerned; but never to the ordinary tribunals. In consequence of this agreement, the licentiates, Don Jose Manuel Mendez, and Don Jose Ygnacio Palomo, were named arbitrators. This appears in a letter dated the 18th of December 1813, from the Marquis of Aycinena to Mr Yard. The same letter informs Mr Yard, that many things which had weighed upon him, had prevented him from carrying on the case personally, as he did in the matter of the accounts, but that he had substituted his power of attorney on the licentiate Don Jose del Valle, who was a lawyer of consummate ability, and his conduct and honesty known to everybody. He, with the approbation of the Marquis, brought a demand asking that the funds deposited at Lima should not be considered as part of the funds of the estate of Yrissari, but that they ought to be delivered to Mr Yard; the money being the nett proceeds of the sales of the goods at Lima. Accordingly, a decree was had that the same should be paid to Mr Yard; and only the remainder should be delivered to Yrissari.

Matters remained in this situation until December 1814, when

the Marquis Don Vicente de Aycinena died, and appointed as the executors of his will, his wife, Donna Juana Pinol, and his brothers, Don Jose and Don Juan Fermin de Aycinena, his executors and trustees, (*tenedores de bienes,* holders of goods), all three jointly, and each one of them separately. There is no evidence that the wife ever acted in the premises, and there is evidence that Don Jose, who resided in Spain, never did act. The execution of the trusts created by the will, as a matter of course, devolved upon the other executor, Don Juan Fermin de Aycinena. In consequence of his executorship, and in conformity to the instructions left him by his deceased brother, he continued the proceedings in the matter of assignment of Yrissari, in behalf of Mr Yard's claim. As executor of the Marquis, the arbitrators, who had been appointed in his lifetime, admitted him to prosecute the claim, and he did prosecute it until its conclusion. It appears that he was not only authorized, but he was obliged by the Spanish law, to prosecute the claim of Mr Yard until he obtained a sentence. His exertions resulted in a decision that the claim of Mr. Yard should be preferred, and paid out of the funds deposited at Lima, in the royal treasury, the proceeds of the cargoes of the Asia and Dolly. The funds amounted to $180,000, to which were to be added $22,000, which were delivered as security to Caballero and Correa, two creditors of Yrissari. From the decision of the arbitrators, an appeal was taken by Don Juan Jose Echeverria, for a commission of $17,000 and upwards, which he claimed, for having received and sold the cargoes by the Asia and Dolly. The whole amount of his commissions was allowed him by the arbitrators, but as this was unavailing, because of the insolvency of Yrissari, he was dissatisfied because the arbitrators did not give him a right of priority on the fund. Under the circumstances, Don Juan Fermin thought it convenient, for reasons set forth in a letter to Mr Yard, to compromise with Echeverria for $8000, about the half of his demand. This obstacle being removed, he appeared legally before the arbitrators, asking that, the rest of the creditors being summoned, the award should be agreed to, as regarded Mr Yard's claim; and that the same should be declared a judicial sentence given at court, that the funds deposited at Guatemala should be declared as belonging to Mr Yard, the same having been substituted in place of those delivered to Yrissari, at Lima; and lastly, he asked for the certificate of sentence to send to Mr. Yard, and to be able himself to appear before the government, and ask for the drafts with which he was to collect the funds. After hearing the creditors, the sentence was agreed to only with regard to the deposits at Lima, and the documents were also ordered to be given to him. With regard to the deposits at Guatemala, it was decided he should plead separately in the case. This was afterwards done; and in September 1818, such progress had been made in the recovery of the amount adjudged to Mr

Yard, that it only remained to receive the official order of the President of Guatemala for the payment.

Don Juan Fermin, after the award, presented a petition to the Viceroy of Peru, which, after stating the case, concludes with a request that his excellency would be pleased to give the necessary orders for the drawing of a draft, by triplicate, of the amount, say $180,000, saving the right of his constituent to the $22,349 and 7 reals more, delivered to Don Ramon Caballero and Don Jose Correa, by way of deposits, and on the proper securities. This petition was sent to the assessor-general, *ad interim*, who reported in favour of a payment of the $180,000 deposited at Lima, but without any notice whatever of the money which was in the hands of Caballero and Correa, by way of deposit.    The report of the assessor-general was approved, and a draft given, of which the Viceroy of Peru was in due form apprised.

Thus the matter stood, when notice of the invasion of Florida and the capture of St. Augustine by General Jackson was received at Guatemala.   The first impression on the government there was, that a war with Spain and the United States would immediately take place; and it was deemed by Don Juan Fermin not only proper to desist from demanding the order for payment, but even to take measures for the security of the property in the event of the war; which was done by him in suggesting certain measures which were necessary, on the part of Mr Yard, for the purpose. But these precautions, and, in fact, all other proceedings on the part of Mr Yard, or his agent, then became unnecessary, in consequence of the treaty made between Spain and the United States, by virtue of which the King of Spain agreed to indemnify the citizens of the United States for injuries sustained by them, which were to be ascertained by a commission instituted in the United States for that purpose.   Mr Yard presented his memorial to the commissioners established by the treaty between Spain and the United States, and received of his claim $124,452.  It would seem that the Florida treaty was not known at Guatemala, and that Juan Fermin continued to act as the agent in the prosecution of his claim up to the time of his death, and was prevented from obtaining payment by the disordered state of the finances of that country.

On these facts, which is a general outline of the case, this action was brought by Mariano de Aycinena, executor of Juan Fermin de Aycinena, against Adolphus Peries, administrator with the will annexed of James Yard.   The declaration contained seven counts, of which five were for money paid, services rendered, &c., by Don Juan Fermin de Aycinena, and the two others for money paid, services rendered, &c., by his executor, Mariano de Aycinena.   The claim was for services rendered, by the testator, as the agent or attorney of Mr Yard, for an amount of $8,551.02½ with interest, paid by him, as his agent or attorney, in compromise

[Peries v. Aycinena.]

of the claim of Echeverria, and for $6086 and interest, costs paid by him. The jury under the charge of the court, found a verdict for the plaintiff, for $43,600.08, and under an instruction from the court filed, a certificate in the following words: " Amount of money paid by the plaintiff, with interest, $36,517.84. We allow plaintiff 7-12ths of 6 per cent. commission."

Errors assigned:

1. That there is a misjoinder of counts in the declaration, there being counts for money paid, services rendered, &c., by Juan Fermin de Aycinena, and counts for money paid, services rendered, &c., after the death of Juan Fermin, by Mariano de Aycinena, executor of Juan Fermin de Aycinena.

2. That the judgment being entered generally on these counts is erroneous.

3. That the Judge erred in instructing the jury, that by the laws of Spanish America, Juan Fermin de Aycinena, as executor of his brother the Marquis de Aycinena, was authorized on the death of the Marquis to take charge of and continue the agency of Mr Yard.

4. That the Judge erred in leaving to the jury to decide whether the amount of $8556.31 paid to Echeverria, and referred to in the receipt of 19th December 1816, was paid by Juan Fermin de Aycinena alone, there being no evidence that the said payment was made by Juan Fermin alone, and the only and written evidence, being that it was made by Juan Fermin, jointly with his co-executor.

5. That the Judge erred in omitting and refusing to charge the jury as a matter of law, that a payment made by Juan Fermin and his co-executor, that co-executor having survived Juan Fermin, could not be recovered in this action.

6. That the Judge erred in saying to the jury that the extent of the substitution of Valle, did not clearly appear, but that in point of law at any rate, if Del Valle had been fully substituted as Mr Yard's agent during the Marquis's lifetime, the effect of the substitution ceased on the Marquis's death, and that such a substitution formed no defence to this action.

7. That the Judge erred in not leaving it to the jury to decide whether the substitution of Del Valle had been made.

8. That the Judge erred in refusing to instruct the jury that the plaintiff was not entitled to recover commissions on the sum of $22,349 paid by the Royal Treasury to Caballero and Correa, in deposit on security.

9. That the Judge erred in leaving it to the jury to decide on the question of commissions on the $22,349, with no other instruction than that if they were satisfied with the plaintiff's explanation, they should decide whether he was entitled to commissions or not.

10. That the Judge erred in submitting the question of com-

missions on the $22,349 to the jury without instructing them as to the principle of law which was to govern that decision.

11. That the Judge erred in refusing to declare to the jury that there was no evidence to show that any portion of the item of $6086.37 for costs had been paid and incurred after the death of the Marquis in 1814.

12. That the Judge erred in leaving it to the jury to decide whether any portion of said costs were paid or incurred after the Marquis's death, and during the lifetime of Juan Fermin.

The case was argued by
*W. B. Reed* and *Binney, Jun.*, for the plaintiff in error; and, *Williams* and *Randall,* for the defendant in error.

The opinion of the Court was delivered by
ROGERS, J., (after stating the case).—The plaintiff in error has filed twelve errors, which will be noticed in their order.

1st and 2d errors. That there is a misjoinder of counts in the declaration, and that the judgment, being entered generally, is erroneous.

It is a general principle that a plaintiff cannot join, in the same declaration, a demand as executor or administrator, with another which accrued in his own right. And such misjoinder is a defect in substance, and is bad on a general demurrer, or in arrest of judgment or in error. 2 *Will. Executors* 115; 2 *Saun.* 117, *note.* Thus if an executor takes a bond from a simple contract debtor, he cannot join a count on such bond with a count on a promise made or debt due to the testator, because the demand on the bond must be in the executor's own right. Nor if the executor performs work and labour, or pays money, can he join it with a promise made to the testator; because they are not the same parties, nor joint owners, nor are the counts of the same nature. *Hosier* v. *Lord Arundel,* (3 *Bos. & P.* 7); *Partridge* v. *Court,* (5 *Price* 419). It is, however, *now settled,* that if the money recovered in each of the counts will be assets, the counts may be joined in the same declaration. This principle is recognised, in this state, in *Stevens* v. *Gregg,* (10 *Serg. & Rawle* 234); *Boggs* v. *Bard,* (2 *Rawle* 102); and the *Bank of Pennsylvania* v. *Haldeman,* (1 *Penn. Rep.* 186). In the last case it is expressly decided, that a promise laid in one count as having been made to the testator in his lifetime, and in another as having been made to his administrator after his death, is not such a misjoinder of counts as will be fatal to a general verdict and judgment. It has been decided, in England, that the same declaration which contains counts on promises to the testator, may contain a count on an account stated with the plaintiff as executor, concerning money due to the testator from the defendant, or concerning money due to the plaintiff as executor; 1 *Taun.* 322; *Cowell* v. *Watts,* (6 *East* 405); or a

count for money had and received by the defendant to the use of the plaintiff as executor; *Petrie* v. *Hannay,* (3 *T. R.* 659); 3 *Day* 34; or a count for money paid by the plaintiff, as executor, to the use of the defendant; *Ord* v. *Tenant,* (3 *East* 104); or a count for goods sold and delivered by the plaintiff, as executor. *Cowell* v. *Watts,* (6 *East* 405).

The same principles are recognised in *Fry* v. *Evans's Adminis-trators,* (8 *Wend.* 530); *Thorn* v. *Paul,* (14 *Peters* 33); 6 *Ohio R.* 94. But it must be stated in the count that the duty accrued to the plaintiff in his representative capacity of executor. It is not enough to say that it accrued to him, "executor," or being execu-tor; it must be averred that it accrued to him "as executor." *Hembell* v. *Roberts,* (5 *East* 150). All the cases cited, go upon the intelligible rule that counts may be joined in one declaration wherever the money recovered will be assets in the hands of the executor or administrator. In *Fry* v. *Evans,* the court express their surprise, that when the principle was once applied, it should ever be departed from. Lord Ellenborough, also, in *Cowell* v. *Watts,* expresses the same opinion. But it is said that this is ad-verse to the principles ruled in *Kline* v. *Guthart,* (2 *Penn. Rep.* 494). It has been already shown that the rule has been repeatedly acknowledged by our own courts. The case of *Kline* v. *Guthart,* as I understand it, merely establishes the general principle that a plaintiff cannot join, in the same declaration, a demand as execu-tor or administrator with another which accrued in his own right. It is very true that in *Kline* v. *Guthart,* which was to recover the price of goods sold to Mary Epley, at the vendue of the personal estate of John Epley deceased, the money, when recovered, would have been assets. But this would seem not to have been adverted to, except by a general reference to the English cases, arranged in 1 *Saund. Plead. and Evidence* 496. But our own decisions on this point were not called to the recollection of the court, by the counsel; nor are they mentioned or referred to in the opinion itself. It certainly was not intended to overrule what we our-selves had solemnly settled, in the *Bank of Penn.* v. *Haldeman,* in the previous year, on the authority of the various recognitions of the rule which had from time to time been made. I agree to the general principles of the case, with the qualification, which is per-haps as extensive as the rule, that it does not hold where the money, when recovered, would be assets. There seems to be more difficulty in applying the principle of joinder of action to the count for work and labour done, than the other common counts. In 5 *Wend.* 38, the Supreme Court would seem to think that it cannot be done. That was a declaration by the plaintiff, as administrator, containing counts for goods sold, work done, and the common money counts, without stating any indebtedness to the intestate, or referring to the plaintiff in his representative character, in any subsequent part of the declaration; which was

held bad on demurrer.  The court say, the second count is for the work and labour, care and diligence of the plaintiff, done, performed and bestowed in and about the business of the defendant.  This was a cause of action belonging to him in his private and individual, not his representative character.  He could not, as administrator of another, have laboured or performed any personal services for the defendant; and it could not be joined with a cause of action accruing or belonging to him as administrator. Admitting the other counts to state, with sufficient certainty, that the cause of action and promises contained in them arose and were made to the plaintiff as administrator, then the second count is improperly joined with them.  It is, in general, true, that there is a distinction between such a count and the money counts; but still cases may be supposed, where the work and labour, although performed by the executor after the death of his testator, may be assets, and may, therefore, be properly joined with a promise to the testator in his lifetime.  As in *Marshall and others, Executors of Talford* v. *Broadhurst*, (1 *Tyrwhitt's Rep.* 348), where a testator, having contracted to build a wooden gallery, died before any of the work was done; and his executors completed it after his death; it was held, that they were entitled to sue for work and labour, and materials found by them as executors; for the sum recovered would be assets.  The cause was tried before Tindal, C. J., who thought the plaintiff could not recover for work and labour, as executor, and doubted whether the contract survived to them, or whether they could take on them the trade and business of the testator, so as to execute his contracts; but permitted a verdict to be taken for the plaintiff, on the count for materials found by the plaintiffs as executors, as the value of these materials would be assets of the testator; giving leave to the defendant to move for a nonsuit.  The court, in bank, differed from the Chief Justice in every particular.  They were of the opinion that executors may legally go on with the performance of the contracts of their testator, left half executed by him, as far as his assets extend.  If a builder, says Bayley, B., having contracted to build a house, dies, leaving it half built, can he be paid *pro tanto*, or are his executors bound to carry it on?  They *may* become chargeable, if they do; but, on the other hand, the testator's assets, in their hands, may be made liable for the breach of his contract.  At all events, they may sue for the testator's materials, supplied by them for the work he contracted to perform.  If a testator contracts for himself *and his executors*, to build a house, they would clearly be liable; but if those words are not used, and yet they complete the house he undertook to build, they may sue for the work and labour as done by them *quâ* executors, and the money recovered would be assets.  Now if the money would be assets, a plaintiff may sue as executor.

Is there any authority to show that executors may not carry on

a testator's business? or that they shall not go on to complete his contracts to a reasonable extent? Many familiar instances might be suggested, in which the half-executed work of a testator ought to be finished for the sake of his estate, through the medium of his executors. In *Edwards's Administrator* v. *Green*, (2 *Meeson & Welsby's R.* 190), it is also ruled, that a count for work done by the plaintiff, as administrator, may be joined with counts for goods sold and work done by the intestate, or promises to him. This case came before the court on special demurrer, assigning for cause, that a count, on a cause of action, accruing to the plaintiff, as administrator, since the death of the intestate, could not be joined to promises to the intestate in his lifetime. In answer to the counsel who argued in support of the demurrer, on the ground that the work and labour done by the plaintiff after the death of the intestate, would not be assets, Lord Abingdon, C. B. observed : "Suppose this was work done in completing a contract of the intestate, as, for instance, in finishing a coat which he had undertaken to make, and commenced making, and had provided materials for completing; the money, when recovered, would be assets." "The administrator," says Parke, B., "may think it for the benefit of the estate to go on with the work the intestate had contracted for, and was bound to complete. If there is any possible case in which an executor can be bound to complete the contract of his testator, then the money, when recovered, would be assets. In order to sustain your argument, says Alderson, B., you must make out that an administrator can in no case complete a contract of his testator, and recover for it, in his representative character. And Lord Abingdon, C. B., observes : An executor may not be compellable to perform the contract of his testator; but if a testator makes a contract to do a specific thing, as to build a wall, and he dies before the wall is finished, his executors could not recover for the work until the wall is finished. In *Ord* v. *Fenwick*, which was an action for money paid by the plaintiff, as executrix, Lord Ellenborough expressly says : If we can suppose a case where the money must have been paid by the plaintiff, as executrix, and for which she must entitle herself to recover as such, the judgment may be sustained. Reference is made to the case of *Marshall* v. *Broadhurst*, (1 C. & T. 403), as an express authority, that an executor may recover for work and labour as executor. Here the point arises, on writ of error, and if we can imagine a case where the money, when recovered, would be assets, (and that we can the instances put abundantly show), the errors assigned cannot be sustained. It is a salutary and practicable rule, attended with the convenience of avoiding a multiplicity of suits. It is possible that it may be attended with some little embarrassment when the estate is insolvent, and when the defendant has a set-off, arising in the lifetime of the testator, to the whole or part of the demand; but this may be obviated by a plea of set-

off to the count, for promises to the testator. Nor is there anything in the objection as to costs. Admitting, however, the full force of the authorities cited, it is said that the contract should be specially set out in the declaration, according to a form in 1 *Chitty's Precedents* 105. This, it is very possible, would be the most formal mode, although this objection does not seem to have occurred to the counsel who argued the cases of *Edwards* v. *Green*, and *Marshall* v. *Broadhurst.* The declarations were in the common form, and after verdict and judgment, clearly good. The objection is rather to a title defectively set out, than to a defective title. The proper time to make the objection was at the trial, and, if made then, the pleader would have had leave to amend. But if the party permits the evidence to go to the jury without objection, he ought not afterwards to complain of it in a court of error. The same objection was made in *Howard's Administrator* v. *Power*, (6 *Ohio R.* 92). " But it is urged," says Judge Wright, " that the declaration in this class of cases should be special and certain, a full statement of facts relied upon for a recovery. Why should this case be an exception to the general rule? Doubtless a plaintiff *in assumpsit may* set forth his *whole case* in the declaration with particularity, taking care to show a valid promise as the basis of his claim. Yet the liberal principles which govern the action, dispense with that particularity in cases where, upon a general statement of facts, the law raises an undertaking, leaving the particulars to be disclosed by proof on the trial. It is sufficient to set forth such facts, as, when proved or admitted, will warrant the court in drawing the legal inference in favour of the plaintiff. It will be obvious to the skilful pleader, that the common count *in assumpsit*, with the facts necessary for its support proven at the trial, secures to the plaintiffs as perfect a right to judgment, as if the same had been first particularly set forth in the declaration, and then proved at the trial. And this general mode of declaring cannot take the adverse party by surprise, or be productive of injury ; for he has a right to demand and receive, before he can be compelled to disclose his defence, a full bill of the particulars which are relied upon against him.

3d Error ; That the Judge erred in instructing the jury, that by the laws of Spanish America, Juan Fermin de Aycinena, as executor of his brother the Marquis of Aycinena, was authorized to take charge of and continue the agency of Mr Yard. In the charge, the Judge said : " The defendant denies that Juan Fermin de Aycinena, as executor of his brother the Marquis, was authorized by the laws of Spanish America, to take charge of and continue the agency, and requests me so to charge in point of law. This I refuse to do, and rule the point against the defendant." By this, I understand the opinion of the learned Judge to be that by the will of the Marquis, in which the plaintiff was named as executor, he was authorized to act in the premises as the attorney

and agent of Mr Yard.   The propriety of this instruction depends on the construction of 23d *tit.* 5th *Partida* 3.   " Again, we say that if the attorney dies before the lawsuit has been commenced by answer, the power of said attorney ends; but if he dies after he had commenced it, his *heirs* can and ought to finish what he had commenced, provided they are men fit to do it." It will be remembered that the Marquis of Aycinena was made one of the attorneys of Mr Yard, with power of substitution; that the suit was commenced in his lifetime, and that he made Juan Fermin one of his executors, with his widow, who from her sex could not well act, and that the other executor was in a distant country, where *he* could not act.   The difficulty lies in the use of the word " heirs," to which, in our law, we attach a particular meaning; but which it does not follow, it has in Spanish America, or in other countries.   Indeed, it is very clear that it has not the same signification with them as with us; for the witnesses who have been examined under the commission to Guatemala, several of whom are distinguished lawyers, referring in express terms to this law, concur in opinion that it includes the case of an executor, who, by virtue of his appointment, not only can but must complete the business once commenced by his testator, with the single qualification that they are men fit to do it.   Jose Ygnacio Palomo, who was a lawyer seventy-two years old, after quoting the law, says, that in obedience to this law, the witness being an arbitrator, when the Marquis died, recognised his executor, Juan Fermin, as a legal party who was authorized and obliged to prosecute the lawsuit commenced by the Marquis, as attorney of Yard; that this point is so expressly determined by the law, that it does not want more explanation.   Jose Mariano Mendez, who is also a lawyer, a doctor of law, (canonical or ecclesiastical, a priest and curate) concurs in the same opinion, and thinks it so clear, that it is only necessary to have common sense to understand it.   The witness also states, after referring to the law, that he who was one of the arbitrators, in compliance with the said law, was bound to recognise him, as he did, as a legitimate party in the prosecution of the suit, which could not be stopped; so much so, that if the executor had refused to act in the case, he (the arbitrator), would have compelled him to do it for this very reason.   With these opinions the other witnesses concur, without exception.   It was therefore rather unreasonable to request the Judge, in opposition to the construction put upon the law by men perfectly versed in it, to charge the jury, that the plaintiff was not authorized by the Spanish law to act in the premises; and more particularly after a judicial tribunal, organized by the agreement of the parties, and under the law of that country, had decided that he was a legal party.   In point of fact, there is no doubt he did so act, and that he continued to do so from the death of the Marquis, until the time of *his* death; that of this Mr Yard was

[Peries v. Aycinena.]

duly informed, that he expressed no dissent, but on the contrary was highly pleased, as he ought to have been, with the exertions of his agent in this delicate business. From the commentaries in the *Curia Felipica*, and from the decided opinion expressed by the learned men who have been examined, it is very clear that the term *hæredos*, used in the law, means executor, or authorized substitute. In relation to executors and administrators, according to the Roman law, which made no distinction in this respect between movable and immovable property, the title "heir" was indiscriminately applied to every person who was called to the succession, whether he was called by the act of the party or by operation of law. Thus the person who was created universal successor, by a will, was called the testamentary heir (*hærus factus*), and the next of kin by blood, in cases of intestacy, was called the heir at law (*hæres natus*), or heir by intestacy. Justice Story observes, in his letter on Foreign Administration, pp. 507, 508, *Confl. of Laws* 418, that the explanations are important in order to fully understand the reasoning of foreign jurists, &c., for the civil law distinctions everywhere pervade the jurisprudence of continental Europe. The executors under the common law in many respects correspond with the testamentary heir of the civil law, and that the administrator in many respects corresponds with the heir by intestacy. Conversant with the civil code, and ignorant of common law distinction between "heir and executor," it may be readily understood why it is that the witnesses, lawyers by profession, should express themselves in such strong terms as to the laws of Spanish-America, and that the tribunals of the country should have admitted the plaintiff as a legal party to the cause.

Ordinarily, the court cannot take judicial notice of the laws of a foreign country; they must be proved, as they were here, as facts. The court was requested to charge the jury on the question, as a point of law; and refusing to do so, is not error, upon that ground, and for the other reasons which have been given.

In the 4th and 5th errors, the defendant complains that instead of instructing the jury according to the position and argument of the defendant, that the amount of $8,556.31, with interest, referred to in a certain receipt of Juan Jose Echeverria, dated the 19th of December 1816, could not be recovered in this action, the Judge instructed the jury that the plaintiff in this action might recover the above amount, if paid by Juan Fermin alone; and left it to the jury to decide, as a matter of fact, upon the evidence, whether the said sum had been paid by Juan Fermin alone, or, as was contended by the defendant, jointly with the Marquis de Aycinena, referred to in the receipt.

The 5th error depends on the 4th; for if there was any proof, however small, that the payment was made by Juan Fermin alone, the court had no alternative but to leave it as a matter of fact to be decided by the jury. In the receipt given by Juan Jose Eche-

verria, the name of the young Marquis of Aycinena is introduced with Don Juan Fermin de Aycinena, as executors of the late Marquis Don Vicente de Aycinena. The great probability is, that in the receipt, which it cannot be pretended is conclusive, and which, by the bye, would, of itself, be no evidence, there is some mistake; for by recurring to the will of the Marquis de Vicente, it appears that the name of the young Marquis nowhere appears as one of the executors. The executors, as appears from the extract of the will, are his wife, Donna Juana Pinol, and his brothers, Don Jose and Don Juan Fermin de Aycinena. Without adverting to the other witnesses who speak of the payment by Juan Fermin, (but who, as the defendants say, refer to the receipt), it is sufficient to refer to the testimony of Echeverria, which fully justifies the course taken by the Judge. Echeverria says that the sum of $8551 2½ reals, paid to the witness by Don Juan Fermin, in consequence of the compromise already mentioned, was paid in silver. And again, he says, said compromise was made at the house of said Aycinena; he does not recollect of any other person being present. Whenever the transaction is spoken of or referred to, except in the receipt, Juan Fermin alone is introduced; the name of the young Marquis neither appears in the will, nor in any other manner. All that is necessary is to show that there is some evidence of the payment by him alone, to sustain the charge of the Judge: and this is not only true, but if this was before us on a motion for a new trial, we would not think ourselves authorized to disturb the verdict.

It is said the plaintiff had no authority to compromise with Echeverria. In the letter of attorney to the Marquis Vicente, power is given to ask, recover and receive all sums of money due to the constituent, taking those means that they may think proper, and adjusting, *compromising* and agreeing, as they may think convenient, &c.; and when doubts or differences occur, to submit said doubts and differences to arbitrators, or amicable composers granting them full jurisdiction, &c., so that by arbitrating, *compromising* and *settling*, they may decide and determine said doubts and differences. These powers would seem to be full and ample, and whatever authority is conferred on the Marquis, is, by the law of Spanish-America, substituted on the plaintiff, by virtue of his office of executor. If, therefore, the original attorney had power to compromise, of which there cannot be entertained a doubt, his substitute had the same authority. As to the expediency of the compromise, there can be but one opinion, when it is remembered that Echeverria had already established his right to commission on the sale of the cargo of the Dolly, to the amount of upwards of $17,000; that he was the only appellant that had entered his appeal to establish his right to a preference on the fund, which alone could avail him, as the estate of Yrissari was insolvent; that before the appeal could be decided, it would take

from two to four years; and that, in the mean time, the fund, which amounted to upwards of $200,000, did not bear interest. It is nothing to the purpose to allege that the heavy loss to Mr Yard was occasioned by the misconduct of Echeverria; for, admitting this to be true, the agent was bound to consult the interest of his constituent, and not his feelings, and in that view was clearly justifiable in paying, by way of compromise, one half his demand, to rid the case of a claim so detrimental, and which, if suffered to remain, might have induced the disastrous consequence of other creditors pursuing the same course. It has been said that the money was to be taken out of the fund when recovered, and was not paid by the plaintiff. But this is in direct opposition to the testimony of Echeverria, submitted to the jury, who expressly says, it was paid to him in silver.

6th and 7th errors; That the Judge erred, in saying to the jury that the extent of the substitution of Del Valle did not clearly appear, but that in point of law, at any rate, if Del Valle had been substituted as Mr Yard's agent, during the Marquis's lifetime, the effect of the substitution ceased on the Marquis's death; and that such substitution formed no defence to this action; and in not leaving it to the jury to decide whether the substitution of Del Valle had been made.

This exception is grounded on the letter of the 18th of December 1813, from the Marquis to Mr Yard. After giving him an account of the state of the business, he says; "many things, that have weighed upon me, have prevented my carrying on the case personally, as I did in the matter of the accounts; and therefore I substituted your power of attorney on the licentiate Don Jose del Valle, the same who had been arbitrator in the matter of the accounts; his having been a judge, in one case, not being an impediment to be a party in another, as you may well perceive. I considered him more fit, on account of the knowledge which our conferences and writings, in the former case, gave him, on some points, that will serve for the decision of this. Besides that, he is a lawyer of consummate learning, and his conduct and honesty are known to every body. Therefore he has all my confidence. He, with my approbation, has brought a demand asking that the funds at Lima should not be considered as part of the funds of the estate of Yrissari."

That the Marquis did not cease to have a general superintendence over the case, is very apparent; although, for some reason not explained, it was inconvenient for him to give his personal exertions, as a lawyer, as before. That Mr Yard took the same view of it, appears from his letter to the Marquis, of the date of the 17th April 1815. "Although I cannot but regret that any circumstance should have rendered it necessary for your excellency to transfer your agency to another person, yet, confiding in the discretion with which you will have made your choice, I doubt

[Peries v. Aycinena.]

not of receiving entire satisfaction, from the kind attention of Don Jose Valle. I beg you to recommend me to the favour and good offices of that gentleman, &c. I presume to hope, however, that although the active part of the agency may be transferred, your excellency will still continue to superintend and aid by your counsel, in all the proceedings," &c. Taking these letters in connection with the fact that Don Valle received fees as a lawyer, and that he has not, so far as we have heard, pretended to have acted in any other character, we think the court were right in their instruction to the jury. It would seem that they were requested to charge the jury, as a point of law, that Del Valle was the legal substitute or attorney of Mr Yard, notwithstanding the death of the Marquis. And if this was so, it was strange that the arbitrators should, with a knowledge of all the facts, have admitted Don Fermin as a legal party to the suit. Besides, the question is immaterial, except as to the amount of compensation, because it is in proof that Mr Yard himself acknowledged Don Fermin as his ·legal constituted attorney; and having done so, it is too late to deny him compensation for the services rendered by him in that character. That a question of agency is ordinarily a question of fact to be submitted to a jury, may be conceded, although it may sometimes be a mixed question of law and fact. But this is immaterial, as it seems to have been submitted to the court as a point of law, on which they were requested to charge the jury. If it was an error, therefore, of which I remain yet to be convinced, it cannot properly be imputed to the court, but to the party (and which party it was does not appear) that desired the direction. By the death of the Marquis, the power of Del Valle necessarily ceased, for the former was accountable for the acts of his substitute, since he is appointed by and in place of the agent; and the appointment is, therefore, naturally withdrawn by the death of the appointee. In the Roman law, the rule is fully recognised, that a mere power or authority expired by the death either of the principal or of the agent. *Story on Agency* 512, *tit. Dissolution of Agency.*

In the 8th, 9th and 10th errors, it is alleged, there is error because the Judge, instead of delivering his opinion and charging the jury that the plaintiff was not entitled to recover commissions on the sum of $22,349, paid by the royal treasury to Caballero and Correa, in deposit on security, did say to the jury, that while the defendants' counsel argued that the conduct of Juan Fermin de Aycinena had not on that subject been sufficiently explained, the plaintiff's counsel contended that it was shown, that further pursuit of said sum would have been not only useless, but worse, as it would have incurred expense without sufficient reason; the said Judge saying, that he left it to the jury to decide whether they were satisfied with the explanation of the plaintiff, also sub-

[Peries v. Aycinena.]

mitted the question of commission on that sum to the decision of the jury.

From the charge of the court, I am inclined to believe that no question was made at the trial, but that there were steps taken by Juan Fermin to recover the whole amount claimed, viz.—$202,349.87, which included the $22,349 paid to Caballero and Correa. Indeed, I cannot see how it could have been so contended, in the face of the evidence, which proves directly the reverse. The documents conclusively proved that he demanded it, and at length requested an order for the amount of $180,000, saving the right of his constituent to that sum. The only debateable ground, therefore, was the one noticed in the charge, whether the conduct of the agent had been sufficiently explained in relation to a *further* pursuit of that money. This the court very properly left to the jury. It seems that after the report of the assessor-general, no further steps were taken; and the probability is, that the report, which made no reservation whatever, and the adoption of the report by the President of Guatemala, were thought to be conclusive of that right. It could only be recovered through the medium of the President, and perhaps this is the reason the witnesses concur in the opinion, that he is entitled to be paid commissions on the whole sum. But this point is no further important than as forming a measure for the value of the services rendered by the plaintiff, in quality of agent. It is not charged *quâ* commissions, but as a standard of the value of his services. If the contract had been for so much per cent. on the amount secured or recovered, it would have been more pertinent to the case. The court left the whole matter to the jury, who have estimated the services at the sum found by the verdict, which is considerably less than the estimate put upon them by the witnesses, at the customary prices of the place where they were rendered; and this, too, without taking into the calculation the interest, which would be a fair item in making the estimate. The witnesses prove that the usual rate is from 6 to 8 per cent.; the jury, as appears by a certificate annexed to the verdict, gave only the 7-12ths of 6 per cent. on the sum of $202,349.87.

It now remains to notice the exceptions to the costs which were paid by the agent, amounting to the sum of $6028.37. These costs were legally taxed by the legal officer as triplicate costs, for a reason fully explained by the witnesses, there being more than one party; and if they were paid by the person admitted to be the legal party to the suit, and who was chargeable with them, and might, as appears in the evidence, have been compelled to pay them, no reason can be given why they should not be refunded by the constituent. And this does not seem to be denied; but the defendants complain that the court ought to have charged, that there was no evidence to show that the costs were paid after the death of the Marquis. But this the court refused to do, but

[Peries v. Aycinena.]

left it as a point to be decided, whether, and how much of the costs had been paid by the plaintiff. He told them, that the plaintiff might recover (and he could give them no other direction) what he had paid. There *was* evidence, and the evidence was very strong, that the plaintiff had paid some, if not all, the costs which had been legally taxed.

In the whole case, we see nothing to prevent judgment being rendered for the plaintiff. In conclusion, I have to remark, that the failure to pay in conformity to the order, is not imputable to the plaintiff, who has acted with diligence and the most entire good faith. The non-payment arose from causes over which the agent had no control. Nor is it his fault that the claim for the Marquis Vicente's services cannot be settled in this suit. It may be an inconvenience to the defendant, but this is a difficulty which could not be avoided except by common consent. It may also be proper to remark, that the only services rendered by Don Juan Bautista Oyarzabal, the co-attorney, were by procuring the withdrawal of the attachment laid on the funds at Lima, for which there is no evidence that he received, or intends to claim compensation.

Judgment affirmed.